## CONTINUATION IN SUPPORT OF
## APPLICATION FOR A SEARCH WARRANT

I, Joshua White, being first duly sworn, hereby depose and state as follows:

1.      I make this continuation of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 616-308-1500 (the "**Target Phone**"), whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054, (the "Carrier"). The **Target Phone** is described herein and in Attachment A.

2.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and I have served as such since July 2022. Prior to serving as an ATF Special Agent, I was employed by the United States Secret Service as a Uniformed Division Officer for three and a half years. My daily responsibilities while serving were to screen passholders and appointments who had access to the White House Grounds, assist with protectee movements onto and off of the White House Complex, and enforce D.C. Code as well as Federal Law. I have completed the Federal Law Enforcement Training Center (FLETC) Uniformed Police Training program (UPTP) and the Criminal Investigator Training Program (CITP) with a total combination of over 800 hours of classroom and practical training. I have completed ATF's Special Agent Basic Training (SABT) academy with over 500 hours of classroom and practical training. I am presently assigned to ATF's Lansing Office conducting narcotics/firearms investigations.

1

3.      The facts in this Continuation come from my personal observations, my training and experience, and information obtained from other agents, investigators, and witnesses. This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this Continuation, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1), Distribution or Possession with Intent to Distribute a Controlled Substance, and 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm (hereinafter referred to as the "Target Offenses") have been committed by Nathanael WILSON. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations. There is also probable cause to authorize law enforcement to employ an electronic investigative technique, more fully described in Attachment B, to determine the location of the **Target Phone.** I am also seeking in Attachment B, pursuant to 18 U.S.C. § 3122(a)(1) 18 U.S.C. § 3123, authorization for the installation and use of a pen register and a trap and trace device.

5.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

6. Upon review of WILSON's criminal history, I located the following felony convictions for WILSON:

a. 02/01/2016: 29th Circuit Court of Michigan – Felony Controlled Substance –Operating/Maintaining a Laboratory in Presence of a Minor.

b. 07/19/2021: 29th Circuit Court of Michigan – Felony Police Officer – Assaulting/Resisting/Obstructing.

c. 2021 – 29th Circuit Court of Michigan– Felony Criminal Sexual Conduct – 3rd degree (Person 13-15).

7. On May 9, 2024, SA White spoke with the Clinton County Sheriff's Office regarding WILSON and his association with 5087 W Centerline Road, St. Johns, Michigan 48879 (hereinafter referred to as the "Target Residence"). Investigators from the Clinton County Sheriff's Office advised that they knew the Target Residence belonged to WILSON and that he was a part of a previous narcotics investigation. In fact, I was advised that they responded to a residential structure fire that was believed to be caused by the manufacture of methamphetamine. WILSON pled guilty to Operating and Maintaining a Laboratory in the Presence of a Minor in the 29th Circuit Court of Michigan (CFN: 15-009526-FH).

8. I queried the **Target Phone** in TLO, a law enforcement database, and the results confirm that the **Target Phone** is associated with WILSON.

3

Confidential Informant Information

9.      In February of 2024, SA Joshua White and TFO Trevor Arnold had contact with ATF CI 32207 regarding WILSON.[1] CI 32207 is known to me, but I have not provided identifying information in this warrant. CI 32207 has previously provided reliable information to the government and other law enforcement agencies regarding multiple suspects that have been corroborated and used to support probable cause in multiple state search warrant applications and have resulted in the seizure of narcotics. I have found CI 32207 to be truthful and reliable.

10.     CI 32207 advised that WILSON sells methamphetamine and distributes narcotics while armed with a firearm. CI 32207 has seen WILSON with a firearm on multiple occasions. CI 32207 also advised that WILSON is a convicted felon. CI 32207 reported that WILSON's phone number is the **Target Phone,** and that WILSON drives a white Chevy Express van, a red Ford F-150, and a white Toyota Corolla with Michigan license plate CMD258, which is registered to WILSON's wife. CI 32207 has seen WILSON with at least six firearms. CI 32207 identified the Target Residence as WILSON's residence.

First Controlled Purchase – the Fourth Week in April 2024

11.     During the fourth week in April, 2024, investigators began preparing for a controlled purchase of narcotics from WILSON. Directly prior to the controlled

---

[1] CI 32207 is cooperating with law enforcement for financial gain.

4

purchase, Lansing Police Department Officer Zolnai established roaming surveillance on 4512 W Centerline Road, St. Johns, MI.

12. Prior to the controlled purchase, at SA White's direction, CI 32207 text messaged WILSON at the **Target Phone**. CI 32207 text messaged WILSON setting up the controlled purchase of methamphetamine in exchange for $80.00 of prerecorded government funds. WILSON wrote in a text message, "Hurry up I'm out of gas at the new farm."

13. Prior to the controlled purchase, SA Mascorro, SA White, and an undercover Lansing Police Department Officer (hereinafter referred to as "UC") met with CI 32207 at a pre-determined meet location. SA White, in the presence of UC, searched CI 32207's person for currency and contraband with negative results, provided CI 32207 with electronic recording equipment, and provided CI 32207 with prerecorded government funds.

14. At approximately 5:45 p.m., prior to the controlled purchase taking place, WILSON called CI 32207 and confirmed that CI 32207 was still coming. [This contact was made in the presence of the UC and was made unexpectedly].

15. Prior to the controlled purchase, at SA White's direction, CI 32207 placed a recorded telephone call to WILSON at the **Target Phone**. During this call CI 32207 advised WILSON that he was still on his way and asked WILSON if it was alright if he still stopped by. WILSON responded, "yeah, yeah, I'm here."

5

16. At approximately 6:11 p.m., CI 32207 and the UC departed the predetermined meet location in the UC vehicle with the UC as the driver and CI 32207 as the front seat passenger.

17. At approximately 6:15 p.m., the UC and CI 32207 arrived at 4512 W Centerline, and CI 32207 exited the vehicle. The controlled purchase took place between approximately 6:15 p.m., and 6:27 p.m.

18. During the controlled purchase, the UC observed WILSON standing in the driveway of 4512 W Centerline. Once the UC and CI 32207 arrived, CI 32207 exited the UC vehicle and walked to the back of the property with WILSON. During this time, the UC observed a white sedan bearing license plate CMD258. Approximately 12 minutes later, CI 32207 and WILSON returned to the area where the UC vehicle was parked.

19. At approximately 6:27 p.m., CI 32207 and the UC departed from the area of 4512 W Centerline and subsequently met SA Mascorro and SA White at a predetermined location.

20. CI 32207 was accompanied by the UC from the purchase location back to the predetermined meet location. Immediately after the controlled purchase CI 32207 gave the UC one plastic container filled with suspected methamphetamine and the electronic recording equipment. The UC then provided these to SA White. SA White searched CI 32207 for currency and contraband with negative results. SA Mascorro and SA White then met with CI 32207. CI 32207 provided the following information regarding the controlled purchase of suspected methamphetamine:

    a. CI 32207 met with WILSON at 4512 W Centerline Rd St. Johns, MI.

    b. WILSON provided CI 32207 with the suspected methamphetamine in exchange for $80.00 in prerecorded government funds.

    c. WILSON retrieved the methamphetamine from a red dodge vehicle where CI 32207 also observed additional methamphetamine being stored.

    d. CI 32207 observed WILSON had a pistol inside of his boot during the controlled purchase. CI 32207 also observed a rifle inside of the garage on a cabinet.

21. Upon return to the LPD Operations Center, the knotted plastic container containing the suspected methamphetamine was field tested. The substance tested positive for the presence of methamphetamine.

CI 32207 Contact – First Week of May 2024

22. During the first week in May 2024, CI 32207 was at the Target Residence, and sent SA White a picture of a firearm and suspected serial number, which he took at the Target Residence. WILSON was at the Target Residence.

Surveillance of Target Residence – Second Week of May 2024

23. During the first week in May 2024, at approximately 2:44 p.m., SA White and SA Hurt conducted drive-by surveillance at the Target Residence and observed multiple vehicles and a white male matching the description of WILSON outside of the Target Residence.

Attempted Controlled Purchase – Second Week of May 2024

24. Prior to the controlled purchase taking place, CI 32207 had unrecorded telephone contact with WILSON at the **Target Phone**. During this contact, CI

32207 set up deal to purchase $80.00 worth of methamphetamine from WILSON at the Target Residence.

25. Prior to the controlled purchase, SA Mascorro and SA White met with CI 32207 at a pre-determined meet location. SA White, in the presence of SA Mascorro, searched CI 32207's person and vehicle for currency and contraband with negative results, provided CI 32207 with electronic recording equipment, and provided CI 32207 with prerecorded government funds.

26. At approximately 3:00 p.m., CI 32207 departed the predetermined meet location in the UC vehicle with CI 32207 as the driver and only occupant of the vehicle. SA Mascorro and SA White surveilled CI 32207 from the pre-determined meet location to the Target Residence. CI 32207 then exited his vehicle and met with WILSON. The attempted controlled purchase took place between approximately 3:08 p.m., and 3:56 p.m.

27. The controlled purchase did not occur, and the deal was canceled. At approximately 3:56 p.m., CI 32207 departed the area of the Target Residence and subsequently met SA Mascorro and SA White at a predetermined location.

28. CI 32207 provided the following information regarding the attempted controlled purchase of methamphetamine from WILSON at the Target Residence:

    a. CI 32207 met with WILSON at the Target Residence.

    b. CI 32207 saw a jar filled with suspected methamphetamine inside the Target Residence.

   c. CI 32207 was at the Target Residence on 5-6-24 and saw methamphetamine. WILSON was present at this time.

   d. WILSON was at the Target Residence with his wife.

   e. WILSON had methamphetamine in his hand and then put it in his pocket.

**TECHNICAL ASPECTS OF PHONE LOCATION INFORMATION**

29. In my training and experience, I have learned that the Carrier provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

9

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30. Based on my training and experience, I know that the Carrier can collect E-911 Phase II data about the location of the **Target Phone**, including by initiating a signal to determine the location of the **Target Phone** on the Carrier's wireless network or with such other reference points as may be reasonably available.

31. Based on my training and experience, I know that the Carrier can collect cell-site data about the **Target Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Carrier typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

32. I also know that the Carrier maintains a proprietary system for cell phone timing advance or per call data measurement known as the True Call, I am also requesting such data.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

34. Because this warrant seeks information that is and/or will be in the Carrier's possession and control, it is my understanding that service of the warrant on the Carrier fulfills my notice requirement under Fed. R. Crim. Pro. 41(f)(1)(C). Accordingly, the requested warrant does not seek permission to delay notice in serving the subscribers under 18 U.S.C. § 3103a. If the Court believes I have an obligation to serve a copy of the requested warrant on **Target Phone**'s subscriber(s), I will submit a revised application requesting permission to delay notice.

35. Prospective location information relating to **Target Phone** is also sought based on the authority of the Pen Register Statute, 18 U.S.C. § 3121 et seq. The government therefore also complies with the provisions of that statute, including by providing the required certification by the attorney for the government as Attachment C to this warrant. Pursuant to the Pen Register Statute, upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an *ex parte* order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the government has certified to the court that the information likely to be obtained by

such installation and use is relevant to an ongoing criminal investigation." 18 U.S.C. § 3123(a)(1).

36. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

37. To facilitate execution of this warrant, law enforcement, including but not limited to the ATF, will use an investigative device or devices (sometimes referred to as a Cell Site Simulator or Wi-Fi geolocation device) capable of broadcasting signals that will be received by **Target Phone**, or receiving signals from nearby cellular devices, including **Target Phone**. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to **Target Phone** and thereby prompt it to send signals that include the unique identifier of the devices. Law enforcement may monitor the signals broadcast by **Target Phone** and use that information to determine **Target Phone's** location, even if it is located inside a house, apartment, or other building.

38. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to

12

devices other than **Target Phone** will be brief and temporary, and all operations will attempt to limit the interference with such devices. To connect with **Target Phone**, the investigative device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The investigative device will not complete a connection with cellular devices determined not to be **Target Phone**, and law enforcement will limit collection of information from devices other than **Target Phone**. To the extent that any information from a cellular device other than **Target Phone** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing **Target Phone** from all other cellular devices.

39. I further request that the Court direct the Carrier to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the Carrier. I also request that the Court direct the Carrier to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Carrier's services, including by initiating a signal to determine the location of the **Target Phone** on the Carrier's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Carrier for reasonable expenses incurred in furnishing such facilities or assistance.

40. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Phone** outside of daytime hours.